UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
SPRING INVESTOR SERVICES, INC.,           )
                                          )
    Plaintiff/Counterclaim-Defendant,     )
                                          )        Civil Action No.
    v.                                    )        10-10166-FDS
                                          )
CARRINGTON CAPITAL                        )
MANAGEMENT, LLC,                          )
                                          )
    Defendant/Counterclaim-Plaintiff.     )
_____)


AMENDED AND CORRECTED MEMORANDUM AND
ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

SAYLOR, J.

         This dispute arises from a contract for services between a hedge-fund manager and a

broker-dealer hired to market its funds and recruit suitable investors.  Both parties have alleged

claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and

violation of Mass. Gen. Laws ch. 93A § 11.

         Defendant Carrington Capital Management, LLC, is a hedge-fund manager responsible

for the investments and operations of several funds.  In 2004, in an effort to market its product

and identify qualified investors, Carrington entered into an agreement with plaintiff Spring

Investor Services, Inc.  Under the contract, Spring committed to perform certain marketing and

recruitment services.  In exchange, the agreement provided for Spring to receive commissions

based on the monthly management fees and annual performance fees earned by Carrington on

investor accounts "serviced" by Spring.

         In October 2005, little more than a year after entering the contract, Carrington terminated

the agreement.  At the time, Carrington provided written assurances that it would continue to pay commissions on all investor accounts serviced by Spring.  However, in the spring of 2006, it ceased making payments.

Spring filed suit in February 2010, seeking payment of all unpaid commissions, as well as attorney's fees, treble damages under chapter 93A, and punitive damages.  Carrington filed a counterclaim alleging material breach of the agreement by Spring and seeking compensatory damages, treble damages under chapter 93A, and attorney's fees.

Each party has moved for partial summary judgment.  Spring has moved for summary judgment on all of Carrington's counterclaims, as well as partial summary judgment on the issue of Carrington's obligation to pay a commission on the fees it has earned on certain undisputed accounts.  Carrington has moved for summary judgment on Spring's chapter 93A claim, all claims for fees based on events after October 1, 2008, and all claims for fees from two investors in the fund, Fix and Paradigm.[1]

## I.    <u>Factual Background</u>

Unless otherwise noted, the facts set forth below are undisputed.

### A.    <u>The Parties</u>

Spring Investor Services, Inc., is a registered broker-dealer based in Massachusetts.  (PSF ¶¶ 3-4).[2]  Spring has been in business since at least 2001.  (PSF ¶ 4).  Jonathan Spring is the sole manager and principal of Spring.  (PSF ¶ 3).

---

[1] Carrington also moved for summary judgment on Spring's claims for relief under the contract's arbitration clause and on Spring's claims for compound relief.  Because Spring has indicated that it does not intend to pursue either claim, the Court will not consider them in this memorandum and order.

[2] Cites to "PSF ¶ __" are to Spring Investor Services, Inc.'s Rule 56.1 Statement of Undisputed Material Facts.  Cites to "DSF ¶ __" are to Carrington Capital's Rule 56.1 Statement of Undisputed Facts.

Carrington Capital Management, LLC, is a hedge-fund manager based in Connecticut. (DSF ¶ 1). Carrington launched its first fund in March 2004. (PSF ¶ 7). As the manager of various funds, Carrington receives fees from the investments made in the fund, and therefore has an interest in increasing capital contributions to the funds. (Pl. App., Ex. 1). Carrington ceased charging management fees from the funds on June 30, 2010. (PSF ¶ 10). Bruce Rose is the founding member and manager of Carrington. (PSF ¶ 5).

**B.      The Agreement**

On October 1, 2004, Spring and Carrington entered into a contract. (PSF ¶ 18). The contract set forth a relationship whereby Spring would assist Carrington in obtaining investors. In particular, Spring agreed to:

- refer prospective investors to Carrington;

- perform marketing and fund-raising, with the goal of familiarizing prospective investors with the funds, and ultimately causing them to invest in the funds;

- assist prospective investors with due-diligence activities;

- continue to communicate with and assist both prospective investors and those who chose to invest in the funds; and

- perform all services in a professional and diligent manner, to the best of its abilities.

(Pl. App, Ex. 1 ¶ 1). The contract contained a provision conferring to Spring exclusive, non-transferable marketing rights for the funds. (Pl. App., Ex. 1 ¶ 4).

In exchange for Spring's services, the contract required Carrington to pay Spring "a fee equal to 20% of all fees collected by [Carrington] on all assets from investors serviced by [Spring] and invested in the funds subsequent to September 21, 2004 . . . ." (Pl. App., Ex. 1 ¶ 2(a)). "Serviced by" was defined broadly as "having been exposed, directly or indirectly to the

3

work product of [Spring] previous to investment in the [f]unds." (Pl. App., Ex. 1 ¶ 2(a)). The contract also indicated that Spring would be reimbursed for all reasonable legal fees incurred in collection of fees and expenses, and could charge interest on fees paid more than thirty days after the agreed-upon payment date. (Pl. App., Ex. 1 ¶ 2(a)).

Carrington retained control over the ultimate decision as to which investors would be included in the funds. (Pl. App., Ex. 1 ¶ 1(h)). The contract specified that Spring "does not represent or warrant that any [p]rospect or [i]nvestor will be qualified to invest in [Carrington's funds], or that [the funds] are suitable for any [p]rospective or [i]nvestor." (Pl. App., Ex. 1 ¶ 1(h)). Those decisions remained with Carrington. Carrington also retained responsibility for proper disclosure to prospective investors, "as applicable under law and regulation, of the compensation arrangement" between Carrington and Spring. (Pl. App., Ex. 1 ¶ 1(h)).

The contract included a provision, entitled "Termination," that governed its length and the means by which it could be ended. That provision reads, in full:

3. Termination

    a. This agreement shall continue for three years, with automatically renewable terms and conditions, from the date hereof, unless terminated by a party. Either party may terminate the Agreement, with cause, immediately, or without cause, on 15 days prior written notice to the other party.

    b. Termination (by either [Carrington or Spring]) shall not affect [Spring's] right to receive the [f]ee. In all circumstances and regards, the [compensation provisions] of Section 2 shall survive the termination of this [a]greement. For purposes of calculating the [f]ee, assets from investors serviced by [Spring] but first invested in the [f]unds more than 180 days after termination shall not be considered assets from investors serviced by [Spring]. [Spring] agrees that in the event of notice of termination it shall cease all [s]ervices with respect to the [f]unds.

(Pl. App., Ex. 1 ¶ 3).

The contract included warranties by both parties concerning compliance with all laws and licensing requirements.  Spring warranted that it held all necessary licenses, registrations, and approvals; it further warranted that it would "perform its duties hereunder in compliance with all applicable federal, state and security laws and regulations, including Rule 206(4)-3 of the Investment Advisers Act of 1940, as amended . . . ."  (Pl. App., Ex. 1 ¶ 9(a)).[3]  Similarly, Carrington warranted that it held all necessary licenses, registration, and approvals, and that it would comply with all applicable laws and regulations.  (Pl. App., Ex. 1 ¶ 9(b)).  Unlike the paragraph governing Spring's compliance responsibilities, the paragraph governing Carrington's responsibilities does not include a specific reference to Rule 206(4)-3.

## C.   Carrington's Termination of the Agreement

The contract remained in force for just over a year.  During that time, Spring contacted potential investors on behalf of Carrington.  At least some of those contacts resulted in capital contributions to the funds by new investors, although the parties dispute the number of new investors and total capital contributions resulting from Spring's services.

On October 15, 2005, Bruce Rose, Carrington's manager, sent an e-mail to Jonathan Spring.  The e-mail contained a notice of termination.  (DSF ¶ 12).  In that e-mail, Rose stated that he had "absolutely no questions at all regarding your loyalty and level of advocacy for Carrington, and for me."  (DSF, Ex. 16).  However, he indicated that "as time and growth of the [funds] assets continues, the slight divergences in approach that may have been at worst nominal

---

[3] Rule 206(4)-3 provides for disclosure to prospective investors of the terms and conditions of any referral arrangement that exists between an investment adviser and a solicitor who receives referral fees for recommending that adviser.  The rule requires, among other things, that a solicitor provide certain written disclosure statements to each prospective client at the time of the solicitation, and that an investment adviser obtain a signed acknowledgment of receipt of these disclosure statements at the time of any investment.

in the beginning are now becoming significantly more magnified." (DSF, Ex. 16).  Rose went

on to discuss a series of meetings Carrington held with various prospective investors referred by

Spring, and the frustrations and problems those meetings caused.  He further explained the basis

of the decision as follows:

> Your marketing style and apparent successes are more suited from my view to the
> startup phase of a fund, confirmed by the size and style of the other funds that you
> represent.  I believe you even indicated as such when we began.  I have said it
> repeatedly; we never forget where we started, but we are definitely NOT a startup
> fund anymore.  Our growth and success longer term will be driven by accurate,
> educated, targeting marketing.  Prescreening and pre-educating investors is the
> responsibility of marketing; not referring database inquiries after sending out a
> DDQ and the investor presentation.  Several meetings referred to us recently have
> been precisely that.
>
> The Carrington Team and I do look forward to continuing to work with you on an
> ongoing basis:  it cannot, however, be on an exclusive basis any longer as we
> need to shift our attention.  This correspondence will serve effectively as the 15
> day notice as required by our agreement.  It is not evident to me that you are
> presently in contact with the level of institutional-type investors that we seek, and
> we do not want to continue the seemingly random meeting pattern with the small
> investor base . . . .
>
> I realize that this all probably appears to be a sudden event and reaction from your
> view; understand that our frustration has been building steadily since the early
> summer.  I have, on multiple occasions, tried to subtly telegraph our frustration,
> but I wanted desperately not to offend you.  My fault; I should have been as blunt
> and direct as I was the other day and I believe I am being in this letter.

(DSF, Ex. 16).

In a separate e-mail sent later the same day, Rose stated that "I will, as always, pay your

fee on a timely basis and continue to do so as per the [a]greement as long as investors introduced

by you remain in the fund."  (PSF, Ex. 2).

### D.      Payments after Termination

Carrington continued to pay commissions to Spring after the October 15 termination of

the agreement on three occasions:  February 3, March 13, and April 24, 2006.  (PSF ¶ 36).  In

total, Carrington paid Spring fees of $530,762 during that period.  (PSF ¶ 37).  On May 10, 2006,

Carrington sent a letter to Spring indicating that it was Carrington's position that Spring had

materially breached the contract prior to its termination, and that Carrington was thus not

obligated to pay any further fees.  (PSF ¶ 38).  Since that time, Carrington has not provided any

payment to Spring.  (PSF ¶ 39).

Spring contends that Carrington has earned $11,759,170.70 in fees on accounts serviced

by Spring; it further contends that as a result, it is entitled to 20% of that amount, or an

additional $1,821,072.14, beyond what it has already been paid.  (PSF ¶ 41).  Carrington

disputes that any payment is still due.

## II.    <u>Standard of Review</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (internal quotations omitted).  Summary judgment is appropriate when the

pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the

evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact

finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco

Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  In evaluating a summary judgment motion, the Court

indulges all reasonable inferences in favor of the non-moving party.  *O'Connor v. Steeves*, 994

F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is

made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id*. at 256-57.

## III.   <u>Analysis</u>

The parties seek summary judgment on six separate issues:  (1) the correct interpretation of the contract's terms concerning the time period for fee payments, (2) plaintiff's claim for fees for the "undisputed" accounts, (3) plaintiff's claim for fees for two disputed accounts, (4) plaintiff's chapter 93A claim, (5) defendant's chapter 93A claim, and (6) defendant's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  The Court will consider each issue in turn.

### A.   <u>The Contract's Fee Payment Provision</u>

It is uncontested that the agreement required Carrington to pay certain fees to Spring, and that the amount of those fees was determined based on the assets invested in the funds by investors who had been "serviced by" Spring.  The parties disagree as to whether the agreement established a time limit for the payment of such fees.  Carrington contends that—barring either early termination or early renewal—all rights and obligations under the agreement, including Spring's compensation rights, automatically expired after three years.  (Def. MSJ at 13).  Thus, Carrington contends that any payment obligations it may have had to Spring ceased on October 1, 2007, three years after execution of the contract.  Spring counters that the contract set forth no such time limit, and that the agreement provided for compensation rights to continue for as long as any investor introduced by Spring remained invested in a Carrington fund.

As noted, Section 3 of the contract is entitled "Termination."  Section 3(a) states:  "This [a]greement shall continue for three years, with automatically renewable terms and conditions, from the date hereof, unless terminated by a party."  Section 3(b) further sets forth that "[t]ermination . . . shall not affect [Spring's] right to receive the fee.  In all circumstances and regards, the terms of [the compensation provision] shall survive the termination of this [a]greement."

The plain language of the agreement unambiguously states that "termination" of the contract does not have any impact on Spring's right to receive a fee.  Carrington does not dispute that fact; rather, it suggests that the scope of the right is defined by the three-year term of the contract set forth in the termination provision.  In other words, Carrington contends that Spring's right to receive fees was understood by the parties to last only for the length of the contract itself.  While a mid-stream termination of the contract would not affect Spring's right to receive a fee for the duration of the contract term, the expiration of that term itself, after three years, would end Carrington's payment obligations.

The language of the contract provides no support for Carrington's interpretation.  The compensation provision of the contract provides that Spring will be paid a fee on *all* fees collected by Carrington on *all* assets from investors serviced by Spring subsequent to September 21, 2004.  The contract contains no time period or end date to limit its compensation provisions.  There is no reference to the three-year contract term anywhere in the compensation provision.  While the parties undoubtedly could have negotiated for an end date for the contract's compensation provisions, there is no indication in the contract that they did so.  The Court will

not read a term into the contract that simply is not there.[4]

To the extent that the absence of such a provision is arguably ambiguous, the Court also finds that the extrinsic evidence, including Carrington's own admissions, weigh against Carrington's interpretation.  In interpreting a contract, "[j]ustice, common sense, and the probable intention of the parties" may be used as guides.  *City of Haverhill v. George Brox, Inc.*, 47 Mass. App. Ct. 717, 720 (1999).  While the Court takes no position on the most "just" interpretation of the contract, both common sense and the probable intention of the parties support Spring's position.  If Carrington's interpretation were correct, and the term of compensation for all investments was set based on the start of the contract itself, Spring's incentives to recruit investors would have constantly diminished as the contract term wore on and the time period for earning fees on new investments constantly decreased.  By the final months of the contract, Spring would have had virtually no incentive to market the fund to new investors.  Such an incentive structure is contrary to common sense.

Furthermore, statements made by Carrington's representative at the time the contract was terminated contradict this interpretation.  On the day the contract was terminated, Rose stated that "I will, as always, pay your fee on a timely basis and continue to do so as per the [a]greement *as long as investors introduced by you remain in the [f]und.*"  (PSF, Ex. 2) (emphasis added).  This statement contains no suggestion of an end date to the fees other than the termination of the investor's involvement in the fund.

Nor is this interpretation of the contract undermined by Carrington's evidence of industry

---

[4] Carrington suggests that this interpretation of the contract converts the contract's three-year term to surplusage.  But that provision makes clear that the agreement could end in two separate ways:  through termination, at any time; or through "expiration" at the end of the three-year term, if any party sent notice of non-renewal.

custom and usage.  Far from supporting its interpretation, the evidence of industry custom raises

further questions about the incentive structure created by Carrington's asserted interpretation.

While each of the three sample contracts submitted as exhibits includes an express end date to

the obligation to pay, these end dates are tied to the date of initial investment, not the date the

contract commenced.  These contracts suggest two things.  First, to the extent there was any

uniform industry custom, it favored an incentive structure that tied compensation to the

investment date, rather than the contract date.  Second, when parties in the industry intended to

limit compensation to a finite number of years, they knew how to do so using an express

limitation in the clause governing the payment of fees.

The language of the agreement imposes no time limit on Spring's right to receive a

commission on assets from investors serviced by it.  As envisioned by Carrington, such a time

limit is contrary to common sense and imposes a restriction that is unsupported by industry

custom and usage and that the parties did not intend.  Accordingly, the Court will interpret the

contract as providing that Spring should receive fees for as long as investors serviced by Spring

remained in the fund.

Carrington's motion for summary judgment on the ground that all possible obligations to

pay fees ceased on October 1, 2007, will therefore be denied.

**B.**      **Fees Owed on the "Undisputed" Accounts**

Spring contends that there are at least 30 investor accounts as to which there is no factual

dispute, because Carrington paid commissions on these accounts through March 31, 2006.

Spring seeks summary judgment obligating Carrington to pay commissions on these accounts for

the period from April 1, 2006, through June 30, 2010.  Carrington sets forth three bases for

opposing the motion.  First, it contends that Spring was a "faithless agent" whose disloyal and

deceptive behavior during the term of the contract excuses any payment obligations and requires

disgorgement of those fees previously paid.  Second, it contends that Spring's material breaches

of the agreement excuse any payment obligations.  Third, it contends that Spring has not put

forth sufficient evidence that it "serviced" the accounts at issue, and thus is not entitled to

summary judgment on the issue.

### 1.      "Faithless-Agent" Doctrine

An agent has a duty to exercise utmost good faith in all dealings with his principal.

Under the "faithless-agent" doctrine, an agent who is guilty of disloyal conduct toward his

principal may lose his right to compensation.  *Little v. Phipps*, 208 Mass. 331, 333-34 (1911).

Even if some services were properly performed, and even if the principal benefitted from those

services, an agent's inappropriate conduct may completely destroy an agent's right to any

compensation.  *Chelsea Indus., Inc. v. Gaffney*, 389 Mass. 1, 13-14 (1983).

Carrington contends that the faithless-agent doctrine excuses it from any payment

obligation to Spring, based on Spring's "disloyal and deceptive behavior."  In particular,

Carrington points to evidence that Spring (1) promoted other hedge funds at the same time that it

promoted Carrington's; (2) deliberately misled Carrington as to its interactions with two

potential investors, Fix and Gottex, so as to secure additional fees; and (3) aided a potential

investor, Palm Beach, in an effort to copy certain proprietary information from Carrington under

the guise of contemplating an investment with Carrington.

This defense fails as a matter of law.  As even the cases cited by Carrington make clear,

the faithless-agent defense arises when an agent is alleged to have breached a *fiduciary* duty.

Carrington has nowhere alleged that Spring owed it a fiduciary duty, let alone identified the actions that constituted a breach of that fiduciary duty.  Nor has Carrington pointed to any evidence in the record that would support an assertion that a fiduciary relationship existed here. Furthermore, the agreement itself states that "[Spring] shall perform these services as an independent contractor . . . ." (Pl. App., Ex. 1 ¶ 1(e)).  An independent contractor does not typically owe a fiduciary duty for the services it performs.  *See, e.g.*, *Intertek Testing Servs. N.A. v. Curtiss-Strauss LLC*, 2000 Mass. Super. LEXIS 354 (Aug. 7, 2000).  There is nothing in the record to suggest that there is any reason to depart from the normal rule in this case.  Thus, the faithless-agent defense is inapplicable to this case, and provides no basis for denying summary judgment.

### 2.        Material Breach as Excuse

A material breach of an agreement is a breach of "an essential and inducing feature of the contract."  *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 11 (1st Cir. 2006).  Such a breach by either party to an agreement will excuse the other party from further performance of their responsibilities under the agreement.  *Id*.  Such a breach can also excuse the non-breaching party from contractual obligations that do not take effect until after the termination of the contract.  *Ward v. American Mut. Liability Ins. Co.*, 15 Mass. App. Ct. 98, 101 (1983). Carrington contends that the evidence demonstrates that Spring materially breached the agreement in October 2005, and that those material breaches excused any further obligation to pay fees under the agreement.

The question of whether a material breach has occurred is generally left to the trier of fact.  However, even assuming such a breach occurred, it is nonetheless irrelevant to Spring's

right to continue to recover fees in the situation presented here.  The agreement's language as to

termination is clear and unambiguous.  The agreement could be terminated in two ways:  with

notice, if the termination was without cause; or without notice, if the termination was for cause.

Termination "for cause," although undefined by the contract, clearly would include termination

as a result of a material breach.

Spring's right to continue receiving fees after termination is also clear and unambiguous.

That right was to survive termination of the agreement in all circumstances.  In the face of such

clear language, Carrington now suggests that the obligation does not survive termination of the

agreement in the circumstance of a material breach.  Where the parties have chosen such plain

and expansive words governing post-termination obligations, the Court will not rewrite the

agreement.  *See, e.g., Walsh v. Atlantic Research Associates*, 321 Mass. 57, 65 (1947) ("It is hard

to see how the plaintiff's hands are so unclean that the court should send him away when he

seeks only that which the defendant has agreed he should have in the very circumstances which

have come about.  Although the defendant did not agree that the plaintiff might be unfaithful, it

did . . . agree as to what should be done with the profits even if the plaintiff should be

unfaithful.").

Carrington's interpretation is contradicted not only by the language of the agreement, but

by its own words and conduct at the time it terminated the contract in 2005.  Despite

Carrington's contention that it terminated the agreement at the time because of Spring's material

breach, it gave no indication that it considered its obligations under the contract to be excused by

such a breach.  Instead, its own statements indicate that it understood the agreement to be in

effect, and undertook to terminate the agreement in accordance with its terms.  Rose e-mailed

14

Jonathan Spring that "[t]his correspondence will serve effectively as the 15 day notice as *required* by our agreement."  (DSF, Ex. 16) (emphasis added).  Later that day, Rose stated that "I will, as always, pay your fee on a timely basis and continue to do so *as per the [a]greement . . . .*"  (PSF, Ex. 2) (emphasis added).  On October 24, 2005, Carrington's general counsel further stated:  "Since we are currently in a period after notice of termination has been sent to you, we assume . . . [§ 3(b)] *to be in effect.*"  (Def. Ctrstmt. to PSF ¶ 105).  Carrington's own actions thus indicate that it intended to terminate the agreement according to the terms set forth in the agreement, including the terms of § 3.

As long as the contractual terms governed, the clear language of the agreement required Carrington to continue to pay Spring's fees.  Thus, Carrington remained obligated to pay commissions on those investor accounts serviced by Spring for as long as those accounts remained in the fund.

### 3.   <u>Evidence That Spring Serviced the Accounts</u>

Spring bears the burden of proving that it serviced each of the accounts at issue, and that Carrington is therefore obligated to pay commissions on those accounts.  Carrington contends that Spring has not put forth evidence that it serviced these accounts in accordance with the agreement.

Spring has come forward with sufficient evidence that it serviced all 30 investor accounts at issue.   Carrington has not disputed that evidence sufficiently to create a triable issue of fact.  Carrington does not dispute that it paid Spring a 20% commission on all 30 of these accounts through March 31, 2006.  Nor does it dispute that its own general counsel sent an e-mail—one that was first reviewed by Carrington's founder and manager—to Spring in December 2005 that

identified the 30 accounts as "having been introduced to [Carrington] by [Spring]," and assured

Spring that it will "receive credit for" any investors on the list.  (Pl. App., Ex. 73).  Rather,

Carrington now suggests that payment of fees on these accounts is not a concession that

these investors were serviced by Spring.  But it cannot create a triable issue of fact by vaguely

suggesting that its own authorized representatives were not actually authorized, or did not mean

what they said.  Carrington's general counsel indicated that Spring would receive fees for these

accounts in a document reviewed by its own founder and manager.  While Carrington has made

vague references to ulterior motives for sending an e-mail misstating Spring's involvement with

these accounts, (Def. Ctrstmt. to PSF ¶ 36) (stating payments were made "to ensure the least

possible disruption to Carrington's business and its relationship with existing limited partners in

the Fund"), it has not set forth any evidence that these accounts were *not* serviced by Spring.

Thus, Spring is entitled to summary judgment that these 30 accounts were serviced by it.

Accordingly, Spring's motion for summary judgment as to Carrington's liability for

payment of commissions on thirty accounts for the period from April 1, 2006, through June 30,

2010, will be granted.

### C.     Fees Owed to Spring for the Fix and Paradigm Accounts

Carrington has moved for summary judgment on Spring's claim for fees for capital

invested in the fund by investors Fix and Paradigm.  Carrington contends that both Rule 206(4)-3

and the terms of the contract bar Spring from receiving payment for these investments.

### 1.     Rule 206(4)-3

Section 206(4) of the Investment Advisers Act makes it unlawful for an investment

adviser to engage in fraudulent or deceptive acts.  15 U.S.C. § 80b-6 (2013).  It further

authorizes the Securities and Exchange Commission to promulgate rules and regulations to define such conduct.

Rule 206(4)-3, promulgated pursuant to this authority, governs the use of third-party solicitors on behalf of registered investment advisers looking to generate business by recruiting new investors.  It is intended to alert potential investors to the potential conflict of interest that exists for solicitors who receive referral fees for recommending a particular fund.

The rule places complementary obligations on both solicitors and investment advisers.  A solicitor is required, at the time of any solicitation activities, to provide certain written disclosure statements to any prospective client.  17 C.F.R. 275.206(4)-3(a)(2)(iii)(A), (b)(1)-(6) (2010). The investment adviser is then obligated to obtain from the client a signed fee-disclosure acknowledgment form prior to entering into any investment contract.

The rule also requires that there be a written agreement documenting any referral arrangement between an investment adviser and a solicitor that expressly mandates that the solicitor provide the client with a written disclosure statement at the appropriate time.  17 C.F.R. 275.206(4)-3(a)(1)(iii) (2010).

### 2.      Contractual Compliance Requirements

There are two relevant provisions of the contract.  First, § 1(h) states as follows:

> [Spring] will not make an offering of interests in the [f]unds to any [p]rospect or
> [i]nvestor.  An offering of interests in the [f]unds and delivery of the [f]unds'
> partnership agreements, offering memoranda and subscription documents, or any
> other documents required to make an offering of interests in the [f]unds under
> applicable law and regulation, are the responsibility of, and shall be made by,
> [Carrington] . . . .  [Carrington] shall further be responsible for proper disclosure
> to [p]rospects and [i]nvestors, as applicable under law and regulation, of the
> compensation arrangement between Manager and Consultant.

(Ex. 1, § 1(h)).

Second, the contract includes a separate relevant provision, entitled "Compliance."  In relevant part, that provision states:

9.    <u>Compliance</u>

a. [Spring] warrants and covenants that it holds and will hold all licenses, registrations and approvals necessary to carry out its duties hereunder; that it will perform its duties hereunder in compliance with all applicable federal, state and security laws and regulations, including Rule 206(4)-3 of the Investment Advisers Act of 1940, as amended . . .

b. [Carrington] warrants and covenants that it holds and will hold all licenses, registrations and approvals necessary to carry out its duties hereunder; that it will perform its duties hereunder in compliance with all applicable federal, state and security laws and regulations . . . .

(Ex., 1 § 9).  Both parties agree that the inclusion of a specific reference to Rule 206(4)-3 was a negotiated addition to the original draft agreement.

### 3.    <u>Applicability of and Compliance with 206(4)-3</u>

Carrington contends that (1) the agreement required Spring to deliver signed fee-disclosure statements from each potential investor as a pre-condition for payment and (2) to the extent that the Court interprets the agreement as allowing payment in the absence of a signed-fee disclosure statement, the agreement is unlawful and unenforceable.  Spring counters that the language of Rule 206(4)-3 is inapplicable, and that nothing in the agreement suggests that compensation is contingent on Spring's ability to obtain a signed fee-disclosure acknowledgment form.

There is considerable doubt as to whether Rule 206(4)-3 even applied to the relationship between Spring and Carrington at the time of their agreement.  As Spring points out, the rule applies only to payments made to a solicitor who "solicits any client for, or refers any client to, an investment adviser."  17 C.F.R. § 275.206(4)-3 (2010).  Carrington does not anywhere suggest

18

that Spring was hired to solicit potential investment advisory *clients* for Carrington; rather, Spring was tasked with soliciting potential *investors* into hedge funds managed by Carrington. Here, Carrington served as the manager of the hedge fund in which Fix and Paradigm ultimately invested; there is no evidence that either entity was ever a client of Carrington's. This reading of the regulation is supported by the agency's own interpretation. *Mayer Brown LLP*, SEC No-Action Letter, 2008 WL 2908929 (July 28, 2008) ("We believe that Rule 206(4)-3 generally does not apply to a registered investment adviser's cash payment to a person solely to compensate that person for soliciting investors or prospective investors for . . . an investment pool managed by the adviser."). However, the Court need not decide this issue, because the matter can be resolved on other grounds. Even assuming the applicability of Rule 206(4)-3, Carrington is not entitled to summary judgment.

It is uncontested that Spring did not provide fee-disclosure statements to either Fix or Paradigm at the time of solicitation, and did not deliver signed fee-disclosure acknowledgment forms to Carrington from either investor. But neither the rule, nor the contract, placed any such obligation on Spring. The rule places the burden of collecting signed fee-disclosure acknowledgment forms squarely on the investment adviser, and nothing in the contract alters that arrangement. Indeed, § 1(h) of the agreement explicitly places the burden of disclosure on Carrington, stating that "[Carrington] shall further be responsible for proper disclosure to [p]rospects and [i]nvestors . . . ." Accordingly, delivery of these forms to Carrington was not a pre-condition of payment, and the absence of the forms is not a bar to Spring's recovery.

Spring's failure to provide fee-disclosure statements to either Fix or Paradigm at the time of solicitation is somewhat more relevant. Spring contends that it solicited both Fix and Paradigm

prior to the termination of its contract, and that the agreement thus entitles Spring to commissions on both investor accounts.  (Pl. Opp. to MSJ at 14).  However, Spring concedes that it did not provide Fix with a fee-disclosure statement until October 22, 2005, and never provided one to Paradigm.  (DSF ¶¶ 21- 22).  Assuming the applicability of Rule 206(4)-3, Spring was thus in breach of the contractual requirement that it comply with the rule.

It does not necessarily follow, however, that Spring's breach excuses Carrington from paying fees to Spring on investments by Fix and Paradigm that would otherwise be due.  While § 206 of the Investment Advisers Act proscribes certain conduct, the rule does not create civil liability or provide for a private right of action.  *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19-20 (1979).  Rather, the statute sets forth a series of judicial and administrative remedies available to the SEC as means for enforcing compliance.  The compliance mechanisms provided by the statute are the exclusive remedies.  *Id.*  Thus, Carrington does not, and cannot, allege that any injury resulted from Spring's breach.  The SEC has not brought any judicial or administrative action against Carrington to enforce compliance.  Nor is there any evidence that either Fix nor Paradigm have complained about the failure to provide disclosure forms, or that the absence of such forms injured their relationships with Carrington.  Without any proof of injury, Spring's failure to make appropriate disclosures does not excuse Carrington's contractual obligations.

Summary judgment on the Fix and Paradigm accounts is thus inappropriate. There is a triable issue of fact as to whether Fix and Paradigm were potential investors who were "serviced by" Spring, as that term is defined in the agreement.  Spring contends that they were; Carrington disagrees.  Both sides have put forth plausible evidence in support of their contentions.  There is

thus a genuine factual dispute for the jury to decide.

Accordingly, summary judgment on the fees owed to Spring for the Fix and Paradigm accounts will be denied.

### D.      Plaintiff's Chapter 93A Claim

Carrington has moved for summary judgment on Spring's claim of unfair or deceptive business practices under Chapter 93A.  Carrington contends that the claim fails as a matter of law for two reasons:  first, that there is insufficient evidence of any unfair or deceptive act, and second, that the complained-of conduct did not occur primarily and substantially within Massachusetts, as required by the statute.  Because Carrington's second argument is dispositive, the Court will address it first.

Section 11 of chapter 93A expressly provides that no action may be brought under the statute unless the complained of conduct occurred "primarily and substantially within the Commonwealth."  Mass. Gen. Laws ch. 93A, § 11.  Carrington bears the burden of proving that the complained-of conduct did *not* take place primarily or substantially within Massachusetts. *Zyla v. Wadsworth*, 360 F.3d 243, 255 (1st Cir. 2004).  The Supreme Judicial Court has indicated that the critical inquiry is "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473 (2003).  In making this determination, a court focuses solely on the actionable conduct said to give rise to the violation; other conduct, no matter where it takes place, may not be considered on the question.  *Id*. at 473-74.

Spring essentially sets forth five factors to support a finding that Massachusetts is the "center of gravity" in this circumstance:  (1) Carrington retained a Massachusetts-based solicitor;

(2) Carrington sent an allegedly coercive letter to plaintiff's counsel in Massachusetts; (3) in that letter, Carrington requested a meeting in Massachusetts; (4) Spring and its counsel both received the letter in Massachusetts; and (5) Spring learned of its losses in Massachusetts.  Even taken in the light most favorable to the plaintiffs, those factors do not support the conclusion that the "center of gravity" of the conduct was in Massachusetts.  Virtually all of the allegedly unfair *conduct*—the alleged decision to coerce Spring, the drafting of the allegedly coercive letter, the mailing of the letter—took place in Connecticut.  Indeed, the only relevant factors that arguably point toward Massachusetts are those that allege that Spring learned of, and felt, financial injury in Massachusetts.

As many courts have previously held, a place of injury within Massachusetts is not a sufficient basis for finding that conduct occurred "primarily and substantially" within the Commonwealth.  *See, e.g., Korpacz v. Women's Prof'l Football League*, 2006 WL 220762, at *5 (D. Mass. Jan. 27, 2006) ("Although plaintiffs themselves reside in Massachusetts and any losses they may have suffered would have been incurred here, defendants' conduct occurred outside of the state."); *see also Central Mass. Television, Inc. v. Amplicon, Inc.*, 930 F. Supp. 16, 27 (D. Mass. 1996) ("[W]hen 'place of injury' is the only factor weighing in favor of a claimant, the admonition of Massachusetts courts that liability under chapter 93A is not to be imposed lightly is particularly relevant.").  Indeed, if the courts were to apply a "place of injury" test, "practically no case involving a Massachusetts plaintiff would be exempt from chapter 93A status, no matter how negligible the defendants' business activity in this [s]tate." *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 310 (Mass. App. Ct. 1988).  Spring has not put forth evidence of any additional conduct by Carrington that could support a finding that Massachusetts

is the "center of gravity" of Carrington's allegedly unfair conduct.  Accordingly, Spring's chapter 93A claim fails as a matter of law, and summary judgment as to that claim will be granted in Carrington's favor.[5]

### E.       Defendant's Chapter 93A Claim

Spring has also moved for summary judgment on Carrington's claim of unfair or deceptive business practices under Chapter 93A.  Spring contends that the claim fails as a matter of law because Carrington has not alleged any facts that rise to the level of a chapter 93A violation.

In its counterclaim, Carrington contends that Spring allegedly violated chapter 93A by "(a) failing to find suitable investors for the [f]und; (b) failing to educate potential investors regarding the [f]und; and (c) attempting to collect fees from Carrington despite its willful and deliberate failure to perform its obligations."  (Countercl. ¶ 31).  In its briefing, Carrington appears to abandon these contentions, and instead sets forth three acts of alleged misrepresentation that it suggests are sufficient to support a chapter 93A claim.  First, Carrington alleges that Jonathan Spring misrepresented his expertise and marketing approach to Carrington

---

[5] Carrington's failure to list the "primarily and substantially" defense as an affirmative defense in its answer did not waive its right to contest the issue.  The purpose of the requirement that a defendant set forth all affirmative defenses at the pleading stage is to provide the plaintiff with adequate notice of a defendant's intention to litigate that issue, and to afford the plaintiff the opportunity to offer evidence and argument relating to the defense.  *See Davignon v. Clemmey*, 322 F.3d 1, 15 (1st Cir. 2003).  While it is true that the "primarily and substantially" defense was not listed as an affirmative defense in Carrington's answer, Spring had clear notice that Carrington disputed that the requirement was met in this case.  Spring alleged in its complaint that "Carrington's unfair and deceptive acts and practices occurred primarily and substantially within the Commonwealth of Massachusetts," (Compl. ¶ 109); Carrington explicitly denied the allegation in its answer, (Answer ¶ 109).  Accordingly, Spring had notice of the defense, and cannot be said to be prejudiced by the omission.  Carrington's answer denying the allegation is sufficient to preserve its affirmative defense.  *Stoneridge Control Devices, Inc. v. Teleflex, Inc.*, 17 Mass. L. Rptr. 335, *14 (Mass. Super. 2004) ("While merely the wording of the answer [denying the 'primarily and substantially' allegation] may seem a bit thin, when read in the context of the purpose for pleading affirmative defenses, the liberality with which notice pleadings are received and the specific authority grants to courts in Rule 8(c), if justice so requires, to treat a pleading as if there had been a proper designation, this Court is disinclined to rule that the defense has been waived.")

in order to induce it to enter the contract.  Second, it alleges that Jonathan Spring lied to

Carrington about contacts with investors Fix and Gottex.  Third, it alleges that Spring tried to

assist a third party in misappropriating Carrington's proprietary tax structure.

To begin, these new allegations are not properly before the Court.  Carrington appears to

have substantially changed the theory underlying its chapter 93A claim, without any attempt to

modify its pleadings.  Spring complains—with ample justification—that the counterclaim did not

provide fair notice of the grounds that Carrington currently asserts as the basis for its chapter 93A

claim.

Furthermore, and in any event, there is simply no allegation in the record of any conduct

by Spring that would rise to the level of unfair and deceptive practices contemplated by the

statute.  To establish a violation of chapter 93A, a "defendant's conduct must be not only wrong,

but egregiously wrong."  *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*,

142 F.3d 26, 41 (1st Cir. 1998).  The conduct must "fall within the penumbra of some common-

law, statutory, or other established concept of unfairness, or [be] immoral, unethical, oppressive

or unscrupulous."  *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st

Cir. 2000) (internal quotations omitted).

Nothing in the record comes close to meeting this standard.  First, Carrington has not

pointed to any evidence that Jonathan Spring misrepresented his marketing experience.  Second,

Carrington has not set forth any evidence that Spring lied to Carrington about his contact with

Fix or Gottex.  Although he may have presented the nature of his communications in a way that

involved something less than full disclosure, he does not appear to have manufactured

communications that did not happen or deceived Carrington about the nature of those

communications.  Finally, Carrington does not cite any evidence to support its allegation that Spring intended to aid a third party in misappropriating Carrington's tax information.  While there is evidence that Spring communicated with Carrington about setting up a conference call with Palm Beach, there is absolutely no support for the suggestion that he did so with an improper purpose.  Pure speculation by Carrington about what he intended is insufficient to survive summary judgment.

Accordingly, Carrington's chapter 93A claim fails as a matter of law, and summary judgment as to the claim will be granted in Spring's favor.

### F.    Carrington's Breach of Contract and Breach of Implied Covenant Claims

Finally, Spring has moved for summary judgment on Carrington's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Spring contends that Carrington cannot prove that it suffered any damages as a result of Spring's alleged breach.  There are two bases for this argument:  first, Spring contends that the damages that Carrington has alleged are too speculative as a matter of law to be recoverable; and second, it contends that Carrington has not set forth any evidence that it caused the alleged damages as a result of foregone opportunities to hire alternative solicitors.

### 1.    Speculative Nature of Carrington's Alleged Damages

Carrington alleges that Spring's actions constituted a breach of contract and a breach of the implied covenant of good faith and fair dealing, and thus deprived Carrington of the value of performance it was entitled to under the contract.  It also alleges that it could have hired alternate solicitors who would have raised more capital than Spring.  Carrington seeks damages to cover the shortfall in Carrington's profits that allegedly resulted from Spring's failure to perform its

obligations and Carrington's foregone opportunity to hire an alternate solicitor.  In other words, Carrington essentially seeks damages in the form of lost profits.[6]

Massachusetts law is clear that lost profits are a recoverable form of damages, so long as they are established with sufficient certainty.  *Augat, Inc. v. Aegis, Inc.*, 417 Mass. 484, 488 (1994).  However, such damages may not be recovered when they are so "remote, or so uncertain, contingent, or speculative as not to be susceptible of trustworthy proof."  *John Hetherington & Sons, Ltd. v. William Firth Co.*, 210 Mass. 8, 21-22 (1911).  The party seeking to recover lost profits bears the burden of proving that they are the proximate result of a breach, and that the amount of loss is "capable of ascertainment by reference to . . . established experience or direct inference from known circumstances."  *Id.*

Spring suggests that Carrington's asserted damages are based on pure speculation, with no adequate foundation in fact.  In particular, Spring contends that Carrington has not introduced any facts into the record to suggest that an alternate solicitor existed, and that such a solicitor would have brought in additional investors.  Spring therefore argues that Carrington will be unable to prove an essential element of its claims, and those claims should be denied as a matter of law.

Carrington has certainly put forth evidence intended to support its damages theory; the

---

[6] Carrington's counterclaim focuses on lost investment revenue caused by the foregone opportunity to hire an alternate solicitor.  However, in its briefing, Carrington suggests that it intends to set forth two separate theories of damages:  expectation damages, based on Spring's alleged failure to perform, and foregone opportunity profits, based on Carrington's inability to hire another solicitor during the term of the agreement.  Although Spring complains that the former theory is newly invented for the purposes of surviving summary judgment, the Court finds nothing in the record to suggest that the expectations damages theory is newly manufactured.  Massachusetts law does not require a party to specify damages at the pleading stage.  *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 352 (D. Mass. 2011).  In addition, given that expectation damages are the presumptive relief for breach of contract, Spring cannot claim lack of notice or prejudice resulting from this theory.  Accordingly, the Court's analysis will consider both theories.

only question is whether that evidence is sufficient to create a triable issue of material fact. Carrington's primary evidence of damages is an expert report, submitted and prepared by Lauren Ryan. (PSF, Ex. 18). That report includes a series of calculations comparing Spring's performance with the performance of other solicitors who Carrington hired during the same time period. For the purposes of those calculations, Ryan took into account certain assumptions. For example, she assumed that Spring breached the agreement, that an available alternate solicitor existed who would have brought in additional investors beyond those recruited by Spring, and that those additional investors would have remained in the fund through June 30, 2010. Ryan's report includes the bases for her determination that certain assumptions were reasonable. For some other assumptions, the report simply indicates that the assumptions were provided to Ryan by Carrington's counsel, and does not indicate her basis for determining that the assumptions were reasonably reliable. Based on her assumptions and analysis, Ryan provided an expert opinion that Carrington has suffered lost-profit damages exceeding $3.9 million. (PSF, Ex. 18).

There is no question that Ryan's report relies on inferences, and that there are at least minor evidentiary gaps in Carrington's damages claim. Neither Ryan nor Carrington's Rule 30(b)(6) deposition designee was able to name an alternate solicitor, and it is not entirely clear that there was a reasonable basis for Ryan's assumption that such an alternate solicitor would have raised more money. However, such questions concerning the reliability of an expert's testimony are better addressed in the form of a *Daubert* motion, and not on a motion for summary judgment.

The cases cited by Spring are not to the contrary. In all three cases, the experts' testimony relied on pure conjecture or speculation in setting forth damages calculations that were

not even arguably supportable by the facts.  In *Atlantic Research Marketing Systems v. Saco Defense, Inc.*, 997 F. Supp. 159 (D. Mass. 1998), plaintiff's damages expert set forth a lost profits estimate that was one thousand times greater than plaintiff's profit records from the highest year on record.  In *Albert v. Warner-Lambert Co.*, 234 F. Supp. 2d 101 (D. Mass. 2002), plaintiff's expert himself admitted that his calculations were not scientific, and he was unable to answer even basic questions about his methodology and assumptions at his deposition.  Finally, in *Van Brode Grp., Inc. v. Bowditch & Dewey*, 36 Mass. App. Ct. 509 (1994), plaintiff's expert's testimony was based on the assumption that the company would experience a dramatic turnaround and unprecedented new profits, without any believable basis for that explanation.

Here, Carrington's expert has relied on certain assumptions, and has employed various inferences to complete her calculations, but has not engaged in anything resembling the pure fabrication of facts present in the above cases.  As a general matter, experts are permitted to make inferences and assumptions, if those inferences and assumptions are scientifically reasonable.  At this stage in the lawsuit, the Court expresses no position as to whether Ryan's testimony should ultimately be excluded because it does not meet the requirements of Rule 702 of the Federal Rules of Civil Procedure—that is, because it is not based on sufficient facts or data, is not the product of reliable principles or methods, or is not a reliable application of those principles and methods.  The Court will withhold ruling on the admissibility of Ryan's report until such time as it has the benefit of *Daubert* briefing on the subject.

However, if Ryan's methods are sound, and if there is a reasonable basis for her inferences, then there is sufficient evidence in the record to support Carrington's claim of damages resulting from lost profits.  The record contains references to numerous other solicitors

28

operating at the time, some of whom were already performing limited work for Carrington. Those references, at least for present purposes, give rise to a reasonable inference that an alternate solicitor was available.  Taken in the light most favorable to Carrington, this evidence is sufficient to survive summary judgment.

<strong>2.      Spring's Causation of Carrington's Losses</strong>

Spring also contends that Carrington cannot meet its burden to prove that Spring caused Carrington to forego hiring other solicitors, and as a result cannot prove that Spring caused its damages.  Spring asserts that although the agreement provided Spring with exclusive marketing rights for Carrington, Carrington nonetheless utilized other solicitors while the agreement was in effect.  Thus, Spring suggests that Carrington must introduce facts that indicate that it could not have hired yet another solicitor, notwithstanding the terms of the agreement.

This argument is unavailing.  Carrington entered into a contract that conferred to Spring exclusive rights to market the fund.  The existence of minor carve-outs or agreed-upon deviations from those exclusive rights does not change the nature of the agreement.  Nor do the facts that Carrington could have chosen to breach that contract, or could have chosen to attempt to negotiate an amendment to the terms of the contract, alter Carrington's duty to abide by the terms of the agreement.  Carrington was entitled to expect that Spring would perform according to the terms of the contract, and was under no obligation to seek to negotiate an amendment to the terms of the contract in order to receive the equivalent of the performance it expected under the agreement.  Similarly, Spring cannot undermine Carrington's breach-of-contract claim by

suggesting that Carrington could have breached first.[7]

Accordingly, Spring's motion for summary judgment as to all of Carrington's counterclaims will be denied.

**V.      Conclusion**

For the foregoing reasons, Spring's motion for summary judgment will be GRANTED as to Carrington's obligation to pay a commission on the fees it has earned on undisputed accounts and as to Carrington's chapter 93A claim, and otherwise DENIED, and Carrington's motion for summary judgment will be GRANTED as to Spring's chapter 93A claim, and otherwise DENIED.


**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: April 18, 2013

---

[7] Spring also points out that Carrington had the right to terminate the agreement at any time, either with or without cause.  Spring contends that if Carrington was dissatisfied with Spring's performance, it could have terminated the agreement, and thus cannot allege damages based on its inability to hire another solicitor.  The question of whether, and when, Carrington had a duty to mitigate damages appears to be a complicated one.  The matter has not been fully briefed by the parties, and any analysis of the subject would likely rely heavily on disputed questions of fact.  Carrington certainly was not required to terminate the contract at the first sign of poor performance, but neither could it sit back and allow damages to multiply in the face of an obvious material breach. At what point Spring's alleged conduct could have crossed that line, and what limitations on damages may result, are questions that cannot be resolved on the present record.